515 P.2d 345

**CITIZEN'S UTILITY, INC., a corporation, Appellant and Cross-Appellee,**

v.

**Mary S. LIVINGSTON, as surviving spouse of Leroy H. Livingston, Deceased, Appellee and Cross-Appellant.**

**No. 2 CA–CIV 1247.**

Court of Appeals of Arizona, Division 2.

Oct. 26, 1973.

Rehearing Denied Nov. 20, 1973.

Review Denied Dec. 18, 1973.

Gaynor K. Stover, Tucson, for appellant and cross-appellee.

Paul G. Rees, Jr., Tucson, for appellee and cross-appellant.

## OPINION

HOWARD, Judge.

This appeal arises from a wrongful death action by the surviving spouse of the deceased. A summary judgment in appellant's favor was reversed in the case of Livingston v. Citizen's Utility, Inc., 107 Ariz. 62, 481 P.2d 855 (1971). The case proceeded to trial before a jury which rendered a verdict in appellee's favor in the sum of $113,000. Appellant's motions for judgment n. o. v. and for a new trial were denied and judgment entered on the verdict. Appellant appeals from the judgment, and the denial of its post-trial motions. Appellee has filed a cross-appeal questioning the trial court's method of computing interest on the judgment.

The facts considered in the light most favorable to upholding the jury verdict are as follows. Appellant operates a public service light and gas utility in the area of Santa Cruz County, Arizona, supplying electrical energy to the city of Nogales, Arizona, and its sister city of Nogales, Sonora, Mexico. A main transmission line runs from its power plant to both cities and carries a current of 13,000 volts. In 1965, appellant regularly employed its own electrical crew which was required by union contract to include a foreman, two linemen and a groundman or operator. For several years prior to 1965, having more line maintenance and replacement work than its one crew could perform, appellant made an arrangement with Dykes Electric Company of Tucson, Arizona, for supplying a second crew and several pieces

of motor equipment on an hourly basis, as required by appellant. The hourly rate charged appellant for each member of the crew was computed by taking the union wage scale per hour and adding about $3 per hour per man. The additional sum was to cover the equipment furnished and various costs of Dykes Electric Company in keeping the crew members on its payroll rather than appellant's.

At all times the Dykes crew members, including appellee's deceased spouse, were covered by Workmen's Compensation through Dykes and the appellant's crew members were covered by its own Workmen's Compensation. Mrs. Livingston received and continues to receive full Workmen's Compensation benefits by virtue of the coverage on the deceased by Dykes. At times during the two-year period the personnel of the Dykes crew changed and the new members were furnished by the union.

The Dykes crew, with the exception of its foreman, Cooley, commuted daily from Tucson and reported to appellant's power house where they were instructed as to the day's work requirements by Mr. Powles, appellant's engineer and assistant manager. The Dykes crew, generally, performed the same type of work as did appellant's regular crew and at times both crews worked side by side. Appellant reserved the right to reject or terminate any member of the Dykes crew and did so on occasion and, as required, Mr. Powles checked the daily work and performance of the Dykes crew on the same basis as appellant's crew. Both crews were shifted as to location and work during the day as emergency or other matters required.

Mr. Powles testified as follows concerning the relationship of Citizen's to the Dykes crew:

"Q. Mr. Powles, do I understand the relationship between the defendant in this case, Citizens Utilities and Dykes, was that Dykes was engaged in the performance of specific definite jobs, or

pieces of work that you would designate to their foreman, Mr. Cooley?

A. That is right.

Q. Their job was to effect a result in accordance with your design or directions to Mr. Cooley as the head of their crew?

A. That is right.

Q. And you told them what result you wanted to achieve, but did you tell them how to accomplish the step by step procedures?

A. No, I left that up to Mr. Cooley."

The Dykes crew, for some time prior to the accident, consisted of Cooley as foreman, two linemen and a ground operator. Two weeks prior to the accident the deceased was sent to Nogales by the union to be the operator while the regular operator was on vacation. During this two-week period, as a ground operator, the deceased worked with the Dykes crew doing general repair and replacement which included work on the main transmission line.

About four p.m. on August 13, 1965, a heavy wind and rainstorm struck the Nogales area and downed five of the poles supporting the main transmission line, interrupting electrical service to both cities. Powles contacted the Dykes crew and dispatched it to the damage site to work with appellant's crew to restore service. Cooley, as senior foreman on the job, was in charge of the work and both crews were under his direction. When the lines went down in the storm, circuit breakers interrupted the flow of electricity to the downed wires. This meant that the lines could be and were worked "cold" by the Dykes crew. The downed lines were connected and raised about six feet off the ground and, after the Dykes crew departed, the circuit breakers were reset and electrical service restored. The lines were then "hot".

The next morning the Dykes crew returned to the job. Cooley was told the lines were then hot. The two Dykes linemen, Harrell and Davis were told by Cooley that the lines were hot. In the utility business it is customary to work the lines hot. Equipment is provided for the purpose of working lines hot. Cooley, Harrell and Davis began working the hot lines with a view to replacing them on new poles. They were using "hot sticks", a tool specifically designed to work wires while they are hot. They were also using special ropes, which did not conduct electricity, to pull the wires. Livingston was initially at a pick-up truck putting cross arms, bolts and insulators on the poles. For some unexplained reason he went up the hill where the balance of the Dykes crew, and the Citizen's crew, under the supervision of Cooley, were working on the hot wires. Davis yelled to Livingston to look out for the wires. Livingston turned, started walking backwards and came in contact with the wires which had been temporarily raised off the ground the previous night. He was electrocuted.

Pursuant to Rule 49(h), Ariz.R.Civ.P., 16 A.R.S., a general verdict accompanied by written interrogatories was submitted to the jury. The jury found that the decedent was not an employee of Citizen's, was a member of a crew working for Citizen's as an independent contractor, that the relationship between Citizen's and Dykes crew was that of employer and independent contractor and that Citizen's did not retain supervision and control over the work being performed by the Dykes crew; and that Citizen's retained control only in effecting a result in accordance with Citizen's design and did not control the manner of execution of the work. (Appellant does not challenge the jury's findings.) It contends the weight of the evidence shows it clearly to be a statutory employer under A.R.S. § 23–902(B) [1] thus rendering it immune from

---

1. This section provides:

"When an employer procures work to be done for him by a contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer, then such contractors and the persons employed by him, and his sub-contractor

suit under A.R.S. § 23–906(A)[2] and A.R.S. § 23–1022(A).[3]

Appellee claims that the recent case of Halenar v. Superior Court, In and For County of Maricopa, 109 Ariz. 27, 504 P.2d 928 is contra to appellant's position in that it holds that A.R.S. § 23–1022(A) does not apply to wrongful death cases and further holds that Article 2, § 31[4] of the Arizona Constitution prohibits application of the employer immunity found in the Workmen's Compensation Act. We do not agree. *Halenar* involves a wrongful death action against a co-employee.

*Halenar* is founded upon the proposition that the legislature cannot interfere with the common law right of an employee to sue a fellow employee because of Article 18, § 6 of the Arizona Constitution which provides:

> "The right of action to recover damages for injuries shall never be abrogated and the amount recovered shall not be subjected to any ·statutory limitation."

■ However, as to suits against employers, the Arizona Constitution in Article 18, § 8, specifically empowers the legislature to interfere within the framework of the dictates of that section. Article 18, § 8, does not grant such power relative to actions against co-employees. Our Supreme Court has consistently ruled that employers who comply with the provisions of the Workmen's Compensation Act are. immune from wrongful death actions if the employee has not exercised his option to reject the provisions of the Act. Worthington v. Industrial Comm. of Ariz., 85 Ariz. 310, 338 P.2d 363 (1959); Coyner v.

Industrial Comm., 77 Ariz. 210, 269 P.2d 712 (1954); Corral v. Ocean Accident and Guarantee Corporation, Ltd., 42 Ariz. 213, 23 P.2d 934 (1933).

The *Halenar* interpretation of A.R.S. § 23–1022(A) does not apply to suits against employers since A.R.S. § 23–906(A) makes it absolutely clear that if employers comply with A.R.S. § 23–961 as to securing compensation they shall not be liable for damages at common law *or by statute* except as provided in the Act.

*Halenar* further stands for the proposition that the legislature cannot prohibit the amount of recovery in a wrongful death action by limiting it as is done in § 23–1046. That section sets limits that can be recovered for burial expenses and bases death benefits on a percentage of the average wage of the deceased. This does not mean that the legislature is prohibited from enacting the conditions upon which one can maintain an action as it has done in A.R.S. § 12–611.

We need not, however, base our opinion upon whether the evidence shows that appellant was a statutory employer. We shall instead, accept the findings and verdict of the jury, as appellee urges us to do and consider the controlling issue.

■ In order for appellee to recover from Citizen's she had to prove the existence of a duty owed to the deceased and a breach of that duty. It is appellee's position that Citizen's duty and liability arises out of its status as the owner of the premises, the easement where the accident occurred. As a rule the owner is not liable for the negligence of an independent con-

and persons employed by the sub-contractor, are, within the meaning of this section, employees of the original employer."

2. This section provides:
"Employers who comply with the provisions of § 23–961 as to securing compensation shall not be liable for damages at common law or by statute, except as provided in this section, for injury or death of an employee wherever occurring, but it shall be optional with employees to accept compensation as provided by this chapter or to reject the provisions

of this chapter and retain the right to sue the employer as provided by law."

3. This section provides, in part:
"The right to recover compensation pursuant to the provisions of this chapter for injuries sustained by an employee shall be the exclusive remedy against the employer . . . ."

4. Article 2, § 31 provides: "No law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person."

tractor. E. L. Jones Construction Company v. Noland, 105 Ariz. 446, 466 P.2d 740 (1970); Parks v. Atkinson, 19 Ariz.App. 111, 505 P.2d 279 (1973). As stated in *Noland*, supra:

"The general rule is that the owner of premises owes to the servant of the independent contractor employed to perform work on his premises the duty to avoid endangering him by his own negligence or affirmative act, but owes no duty to protect him from the negligence of his own master. Murk v. Aronsen, 57 Wash.2d 785, 359 P.2d 816; Campbell v. Jones, 60 Wash. 265, 110 P. 1083. See Seattle Aerie No. 1 of the Fraternal Order of Eagles v. Commissioner of Unemployment Compensation & Placement, 23 Wash.2d 167, 160 P.2d 614, 163 P.2d 921." 105 Ariz. at 455, 466 P.2d at 749.

This general rule is subject to exceptions. Appellee claims that the Restatement (Second) of Torts, § 414 creates a duty of reasonable care for the employee of an independent contractor "when the occupier of land exercises 'control' over the work premises." This is not true. § 414 states:

". . . One who entrusts work to an independent contractor, but who retains the control of *any part of the work*, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Emphasis added)

Comment *a* provides:

"If the employer of an independent contractor retains control *over the operative detail of doing any part of the work*, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work

shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." (Emphasis added)

Thus it can be seen that § 414 has nothing to do with control over the *premises* but applies only to control or supervision over *the work* being performed by the independent contractor.

Appellee's position in both the trial court and this court has been that Citizen's exercised no control or supervision over the work being done by the Dykes crew.

In the answers to the interrogatories the jury found that Citizen's did not retain supervision and control over the work being performed by the Dykes crew. Interrogatory No. 4, submitted to the jury at appellee's request, was answered in the affirmative. This interrogatory stated:

"If you find that the relationship between Citizen's and the Dykes crew was that of employer and independent contractor, did Citizens retain control only *in effecting a result* in accordance with Citizen's design and not *control the manner of execution of the work*." (Emphasis in original)

Contrary to appellee's contention, our decision in Welker v. Kennecott Copper Co., 1 Ariz.App. 395, 403 P.2d 330 (1965), does not support her position. We stated:

"This court is aware that there are decisions holding that an owner may retain general supervision and control as to the *results* of the work without becoming personally liable for the failure to exercise such controls. [citations omitted]. It is not believed that this decision is in conflict with this law. This court holds that such law should be confined to situations where power of supervision is re-

tained so as to control the results of the work and the right to control the manner of the doing of the work is not present." 1 Ariz.App. at 406, 403 P.2d at 341.

Retained controls over the work entrusted to an independent contractor may expose the owner to liability for injuries to an employee of the independent contractor. Welker v. Kennecott Copper Company, supra; Restatement (Second) of Torts § 414. Furthermore, the owner of the premises owes a duty to the employee of an independent contractor under Restatement (Second) of Torts § 343. Welker v. Kennecott Copper Company, supra.

\*     \*     \*     \*     \*     \*

"As stated in § 342, the possessor owes to a licensee only the duty to exercise reasonable care to disclose to him dangerous conditions which are known to the possessor, and are likely not to be discovered by the licensee. To the invitee the possessor owes not only this duty, but also the additional duty to exercise reasonable affirmative care to see that the premises are safe for the reception of the visitor, or at least to ascertain the condition of the land, and to give such warning that the visitor may decide intelligently whether or not to accept the invitation, or may protect himself against the danger if he does accept it." Restatement (Second) of Torts § 343, comment b at 216.

Therefore, appellee would only be entitled to recover for a breach of Citizen's duty under § 343 and § 343(A), Restatement (Second) of Torts.

■ Generally, the landowner performs his duty by giving a warning. Gulf Oil Corp. v. Bivins, 276 F.2d 753 (5th Cir. 1960), cert. denied 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61; Gallo v. Leahy, 297 Mass. 265, 8 N.E.2d 782 (1937). This duty to warn is fulfilled by giving a warning to the supervisory officials of the employee. Gulf Oil Corp. v. Bivins, supra; Levesque v. Fraser Paper Limited, 159 Me. 131, 189 A.2d 375 (1963); Grace v. Henry Disston & Sons, 369 Pa. 265, 85 A.2d 118 (1952);

Crane v. I. T. E. Circuit Breaker Co., 443 Pa. 442, 278 A.2d 362 (1971); Texas Elec. Service Co. v. Holt, 249 S.W. 2d 662 (Tex.Civ.App.1952); Crawford Johnson & Co. v. Duffner, 279 Ala. 678, 189 So.2d 474 (1966).

It was appellee's theory below that the danger was latent since the night prior to the accident the line had been worked cold. Accepting this theory we believe that when appellant fulfilled this duty by notifying the Dykes' foreman of the condition, then § 343a(1), Restatement (Second) of Torts, comes into play and must be read with § 343. Hanson v. Town & Country Shopping Center, Inc., 259 Iowa 542, 144 N.W. 2d 870 (1966); Annot. 35 A.L.R.3d 230, 254. § 343A(1) reads:

"A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" (Emphasis added)

■ Appellant's warning to Cooley also sufficed under § 343A(1) to relieve it of liability. Citizen's knew that Cooley was an experienced foreman, would appreciate the dangers of electricity and would therefore warn his crew. In fact, Davis and Harrell both testified that Cooley did warn Livingston that the lines were hot. There was no evidence to the contrary. Assuming arguendo, that Cooley did not tell the deceased, the negligence then was on the part of Cooley and not appellant Citizen's. Dykes was hired to work on hot lines. It held itself out to Citizen's as "workers of hot lines." It would indeed be anomalous to hold a landowner liable for injuries to employees which result from doing the very job they hold themselves out to do. If a member of its crew was ignorant of the consequences of electricity or wandered away from the job he was supposed to do, the fault lies with Dykes and not appellant.

In view of our disposition of this case we need not decide appellee's cross-appeal.

The judgment is reversed with instructions to enter judgment in favor of appellant and against appellee.

HATHAWAY, C. J., and KRUCKER, J., concur.